# VALTON *a.* THE NATIONAL LOAN FUND LIFE ASSURANCE SOCIETY.

*Supreme Court, Third District; General Term, Sept.,* 1863.

QUALIFICATIONS OF JURORS.—CHALLENGE.—HEARSAY.—RES GESTÆ.—PARTNERSHIP.—SUGGESTION OF MISTAKE BY WITNESS.—INSURANCE.—MISREPRESENTATION BY INSURED.

A juror, not a freeholder, nor assessed in respect to any personal estate, should be set aside, although it appears that he is worth in personal property, above all debts, two hundred and fifty dollars.

On an issue as to the terms and good faith of a partnership, the instructions given to the conveyancer who drew the partnership articles are admissible as a part of the *res gestæ.*

Where a judge, in charging the jury, informed them that they were to say whether a witness, who was not contradicted or impeached, was mistaken in his statements of a conversation which took place twelve years before,—*Held,* that such instruction was proper.

Misrepresentations as to the pecuniary condition of an applicant for a life insurance, made to the medical examiner selected by the insurers, do not invalidate the policy.

Where an applicant for a policy of life insurance untruly represented to the general agent of the insurance company, and also to its medical examiner, that he was a moneyed man, and the company in defending an action on .the policy offered to show that the medical examiner would have recommended the rejection of the risk, if the truth had been disclosed to him,—*Held,* that the evidence was inadmissible.

Appeal from a judgment, and from an order denying a motion for a new trial, and for leave to amend answer.

This action was brought by Gerard Valton, and Amos Adams, the latter as assignee of Daniel Martin, against The National Loan Fund Life Assurance Society, to recover the sum of $10,000, and interest, upon a policy of insurance issued

by the defendants on the life of one Conrad Schumacher. Shortly after the issuing of the policy, the plaintiff Valton, with Daniel Martin and Schumacher, entered into partnership as liquor dealers, in Albany, agreeing that in case of Schumacher's death, during the partnership, unmarried, it should become the absolute property of Valton and Martin, to be divided equally between them, or the survivor, and the executors or administrators of the other, if either should happen to die. In such case, Valton and Martin, or the survivor of them, was authorized to collect the amount of the policy. Martin's interest had been transferred to the plaintiff Adams. On a previous trial a verdict and judgment for plaintiffs had been affirmed at general term (22 *Barb.*, 9), and the judgment subsequently reversed in the Court of Appeals and a new trial ordered. (20 *N. Y.*, 32.)

The second trial was before Mr. Justice Miller and a jury, in February, 1862.

A jury having been regularly drawn by the clerk, each party exercised their right of peremptory challenge, and the four jurors so challenged having been excluded from the panel, the plaintiff challenged, for principal cause, one John Denmee, who had been drawn as a juror for the trial. Denmee, being examined in respect to his qualifications as a juror, stated that he resided in the fourth ward of the city of Albany; that he owned no real estate, and had not been assessed in respect to personal estate. Said juror further stated, that he was worth the sum of $250 over and above his debts. The judge sustained the challenge, and set the juror aside. The defendants excepted.

William J. Hadley, counsellor-at-law, a witness in behalf of plaintiffs, testified, among other things, that in the early part of May, Martin, Valton, and Schumacher called at his office, in Albany, and directed him to prepare their articles of partnership; and in the course of the instructions, they stated what their business was; that Valton and Martin were to supply the capital; that Schumacher was skilled in mixing liquors, and in making Holland gin, and his services were to be put in as against their capital. All this testimony was separately objected to on the following grounds: 1. That it was declaration and hearsay. 2. That it was immaterial. 3. That the articles of copartnership were the only competent evidence of the

agreement. 4. That under the pleadings no partnership, prior to the 30th of May, can be proved. 5. That no partnership can be shown, if material, by the statements of parties to their attorney. The judge overruled the objections, and the defendants excepted.

The same witness also testified, that having prepared the articles of copartnership, in pursuance with the instructions, he left them with one of the parties for examination; that they kept the articles some time, and returned them to him, with instructions to make an addition to them; that they instructed him that Schumacher had effected a policy of insurance in defendants' company for $10,000, and that they wished it inserted in the articles that in case of his death, unmarried, his interest in the policy was to take the same direction as his interest in the business. Defendants objected to this testimony, on the same grounds stated in the last objection. The court overruled the objection, and admitted the testimony only as part of the *res gestæ*, and the defendants excepted.

Valton, one of the plaintiffs, called as a witness in behalf of himself and his co-plaintiff, testified that he became a partner with Martin & Schumacher, in April, 1850, and that the business commenced on the 1st or 2d of May, 1850; that about the middle of May, he and Valton and Schumacher talked about a policy of insurance; that Schumacher wanted to have his life insured, and had intended to commence a gin distillery in New York; that Valton and Martin should advance the money for him, because he expected money from his uncle in Germany, who he said was very rich; and if the money would not come, and the business would not succeed, he would insure his life, so Martin and Valton should not suffer any loss. The witness did not recollect how much they were to advance, but he thinks Schumacher said it would require much money; Schumacher was to have the distillery in New York; that he wanted to buy or rent a house; that machinery was to be put in the distillery. The witness did not recollect that any distillery had been hired, or machinery bought.

William Lacey, a witness called by the defendants, testified that in 1850 he was the agent at Albany for the defendant's insurance company; that in February or March of that year, Martin applied for a policy of insurance for $10,000 on the life

of his friend or partner, of the age of either 33 or 34 years. On the 14th of May he applied again to the witness, wanting to effect the insurance of which he had spoken; when the witness gave him the blanks, the proposal, and the certificate, to be signed by Dr. Staats, the medical examiner at Albany of the defendants. When Martin brought Schumacher to the agent's office, he was introduced by Martin to Lacey as the person whose life was to be insured. Lacey then said, Why, I suppose this man is your porter? Martin said, No; we are all Germans, working together in the store. Lacey replied by saying that he did not like to take his life for $10,000; that he did not like the look of the thing. Martin then said, He is the moneyed man of the concern, and it's all right. Lacey had previously seen Schumacher in a baize apron sweeping the street in front of the store. The witness further testified, that he believed the representation made to him that Schumacher was the moneyed man of the concern; that from what he had seen of Schumacher, he would not have acted upon the application to insure his life for $10,000, if Martin had not represented that he was the moneyed man of the concern; that he would not have recommended the risk, and would not have sent the papers to New York, unless accompanied by a recommendation to reject it. Dr. Barent P. Staats, called as a witness on behalf of the defendants, testified that he was their local physician in Albany, in 1850; that he recollected the application for the insurance on Schumacher's life. Referring to the certificate, he said it was the one given by him; that on the morning of its date Martin called on him to know at what time he could examine his partner Schumacher. Witness appointed one o'clock of that day, at which time Martin called with Schumacher upon witness. Witness stated, that as his pay was graduated by the amount of insurance, witness asked him how much he was going to insure for. Schumacher said it was $10,000. Witness replied to him, he must take off his coat or jacket, he must have a good indorser; it was a large amount, and he must have a good indorser for so large an amount. Witness said he meant thereby he must have a more thorough examination. Martin observed to witness, he must not judge from appearances; that Schumacher was the moneyed man of the concern. The witness testified that Schumacher was dressed

very common, and looked like a laboring man. The certificate
of the medical examiner consisted in answers to nine questions,
all of which he was requested to answer minutely.

The last and ninth one was, " Opinion on the life."   ☞ " A
decided opinion, recommending the acceptance or rejection,
and of the proposal." To this latter question, Dr. Staats, the
medical examiner, certified as follows:

" A good risk; I recommend acceptance." The witness fur-
ther testified, that he was accustomed to give an opinion on the
whole case ; that opinion was required to be decided. The
witness was then asked by defendants' counsel the three fol-
lowing questions: 1. " If it had not been for the representa-
tion that Schumacher was the moneyed man of the concern,
would you, from your knowledge and observation of Schu-
macher, have recommended the acceptance of the proposal?"
2. " Did the representation in question produce "any, and if
any, what effect on your mind?" 3. " Did the said represen-
tation have any influence, and if any, what, upon your subse-
quent action in making your certificate and report ?" These
questions on being put to the witness were severally objected
to by plaintiffs' counsel, and excluded by the court, and de-
fendants' counsel excepted.

Valton testified that Frederick Oltman was hired as a clerk and
porter in the store of Valton, Martin & Co., at the rate of $30
per month and his board. Valton could not recollect whether
he was hired when they opened the store, or a few weeks later.
Oltman lived at Martin's house in Albany. Oltman was a Ger-
man; he was a copyist in that country.

It appeared that Schumacher came to the Shakespeare Hotel
in New York, and registered his name there on the morning of
the 23 of August, 1850. He came without baggage. He asked
the proprietor of the hotel the price of board per week, and
upon being informed that it was $4 per week, he said he would
pay in advance, as he had no baggage, and that he would fetch
the money from his boss, Valton: at other times he called Val-
ton " the old man." Oltman came to the same hotel on the
morning of the 30th of August, 1850. Valton was then in New
York. Valton stated that at about 10 o'clock on the morning
of the 4th of September he saw Schumacher and Oltman in the
City Hall Park, in New York. Schumacher and Oltman told

him they were going a-fishing, and that they went towards the
North river. Oltman testified on a commission, that on the
4th of September, 1850, he was in a small boat in company
with Schumacher, crossing the Hudson river to the city of New
York, and that while crossing the river and opposite New York,
Schumacher accidentally fell .overboard and was drowned.
Liévre, the proprietor of the Shakespeare Hotel, testified that
Oltman came to the hotel about seven o'clock in the evening
of the 4th of September, and said that Schumacher was drown-
ed; that he took a drink as soon as he came in, and that he
behaved so comfortable that it made bad. feelings in the wit-
ness.

There was a considerable amount of testimony produced on
both sides bearing upon the question, whether a body found on
the 7th of September, 1850, floating on the North river, near
Jersey City, was that of Schumacher or not. The chief proof on
this point consisted in the testimony of Valton, who identified .
a neck-handkerchief and pair of pantaloons taken from the body
as having been worn by Schumacher when he was last seen by
Valton; and the testimony of his son-in-law Bussing, who also
identified the neck-handkerchief. The corpse was so much
disfigured that persons who had known Schumacher in his life-
time could not, with the exception of Valton, be positive as to
the identity, though they expressed a belief that it was Schu-
macher's body.

At the conclusion of the testimony on both sides, the defend-
ant's counsel moved to dismiss the complaint on the following
grounds: 1. That it appears by evidence, which is uncontra-
dicted, that the policy was taken out, or procured to be taken
out, for the benefit of Valton and Martin. 2. That it appears
by evidence, which is uncontradicted, that said policy was
taken out under an agreement that the same, when taken out,
should be assigned to Martin and Valton; that said policy was
assigned pursuant to said agreement, and that it does not ap-
pear that Martin and Valton, or either of them, received or
ever held said policy as security, or indemnity for any obliga-
tion or liability incurred by them. 3. That it does not appear
that said policy of insurance was assigned to Martin and Valton
upon any valid consideration whatever. 4. That it appears by
evidence, which is uncontradicted, that said policy was taken

out as security for such sums of money as Martin and Valton might advance in the procuring and establishment of a distillery, and that it does not appear that Martin and Valton, or either of them, advanced any moneys or incurred any liabilities whatever, on the faith of said policy.

The motion was denied by the presiding judge as to each ground, and the defendant's counsel separately excepted as to the decision on each of said grounds.

At the close of the charge, the presiding judge was, among other things, requested to charge as follows: That there was no evidence in the case that the second instalment of premium on the policy was paid by Schumacher; and that the fact, if proved, that a letter was sent from Schumacher to Martin, stating that in it was inclosed the money for the payment of said second premium, is no evidence that the money was sent by Schumacher to Martin. The judge charged the jury that the fact that a letter was sent from Schumacher to Martin, stating that in it was inclosed the money for the second premium, was no evidence in itself that the money was sent from Schumacher to Martin, but declined to charge that there was no evidence in the case that the second instalment of premium on the policy was paid by Schumacher; and as there was evidence on this subject, submitted the question to the jury to determine how far the evidence established the fact of the payment of the second premium by Schumacher: to which part of the charge as given, and to declining to charge as requested, the counsel for the defendants then and there excepted. The counsel for the defendants then excepted to the judge's charging the jury that they were to say whether Lacey was mistaken, and whether, after the lapse of twelve years, he does not recollect the exact language used on that occasion. The counsel for the defendants then requested the judge to charge the jury, that when the witness Lacey made a positive statement, the jury was not at liberty to disregard it, unless he was contradicted or impeached. The presiding judge declined so to charge, but instructed the jury that it was purely a question for them to determine, in view of the facts stated by him and the other evidence in the case, whether, after the lapse of time, the witness Lacey had or had not correctly stated what Martin said as to Schumacher being the moneyed man of the concern; to

which part of the charge, and to the refusal of the judge to charge as requested, defendant's counsel excepted.

The jury rendered a verdict for the plaintiffs for $17,825.48. A case was thereupon made by the defendants, containing the evidence and exceptions: the same having been duly settled, judgment upon the verdict was perfected by the plaintiffs on the 2d of February, 1863.

It was thereupon stipulated between the attorneys for the respective parties that the defendants have leave to move for a new trial at special term, in the same manner as though judgment had not been entered.

The defendants accordingly made such motion at a special term of this court on the 2d of March, 1863; and they also, at the same time, upon affidavits, moved for leave, in case the motion for a new trial should be granted, to amend their answer by adding the following allegation at the end of the 7th paragraph of said answer:

"And upon information and belief, the defendants allege that the said Valton and Martin procured the said policy of insurance to be issued and assigned to them, and the same was so issued and assigned, as security for such sums of money as they might advance for the purpose of the business of a gin distillery, to be commenced by them and the said Schumacher, and to indemnify them against any losses in said business; that the said Valton and Martin advanced no moneys for the purposes of said business, nor did they sustain any loss therefrom."

The court, at special term, denied the motion for a new trial, and from the order denying said motion, and from the judgment, the defendants appealed to the general term of this court. Prior to the taking of this appeal, the plaintiff Amos Adams died, and his executor, John F. Batchelder, was, by an order of this court, substituted as co-plaintiff with Valton.

*Lyman Tremain* and *Henry Nicoll*, for the appellants.— I. The evidence at the trial established that the policy of insurance was not taken out for Schumacher's benefit, but under an agreement that the same should be held by Valton and Martin as security or indemnity for moneys to be advanced: the plaintiffs failing to show any moneys advanced or liabilities incurred, were not entitled to a recovery. 1. The agreement for a pat-

nership was, in point of fact, prior to the issuing of the policy.
Martin applied for the policy and paid the premium: the policy
was delivered to him: Schumacher took no part beyond signing the proposals and submitting to examination.  2. The pretence of the plaintiffs, that the policy was taken out to protect
Martin and Valton against the loss of Schumacher's services
and skill in case of his death, is without reasonable foundation;
their contingent title to the policy under the partnership agreement, is wholly inconsistent with the idea of their having taken
it as security or indemnity for any such loss.  3. A policy of
insurance effected on life is a wager contract, and unless issued
for the security or indemnity of the party taking out the policy,
is void by the Statute against betting and gaming.  (1 *Rev.
Laws*, 223, ch. 44, § 5; Bunn *a.* Riker, 4 *Johns.*, 426; Campbell *a.* Richardson, 10 *Ib.*, 406; 1 *Rev. Stat.*, 662, §§ 8, 9.)
4. Every person is presumed to have an interest in his own
life, which he may insure; but such presumption does not exist
in favor of a third person effecting an insurance, for his own
benefit, on the life of another.  In the latter case, there can be
no recovery, unless an interest in the life insured be affirmatively shown.  (Amory *a.* Gilman, 2 *Mass.*, 1; Rhind *a.* Wilkinson, 2 *Taunt.*, 237; Halford *a.* Kymer, 10 *Barn. & Cress.*,
724; Wainwright *a.* Bland, 1 *Mees. & Welsb.*, 32; S. C., 1
*Mood. & Rob.*, 481; Lucena *a.* Crawford, 2 *Bos. & Pul.*, 324;
Stockdale *a.* Dunlap, 6 *Mees. & Welsb.*, 224; *Angell on Fire
& Life Ins.*, §§ 68, 297, 298.)  5. There is no substantial difference between a policy of insurance taken out by one person
on the life of another, and a policy issued to one individual on
his own life, and assigned by him to a third person, under an
agreement to do so made prior to the issuing of the policy.  In
either case, the assignee is virtually the party insured, who can
only recover upon proof of an interest in the life insured.
(Wainwright *a.* Bland, 1 *Mood. & Rob.*, 481.)

II. The testimony of the witness Hadley, that when Martin,
Valton, and Schumacher called to have him draw up the articles
of copartnership, it was mentioned that Schumacher was a person skilled in mixing liquors and in making Holland gin, was
improperly admitted as evidence.  (1 *Greenl. Ev.*, §§ 108, 109,
114; Enos *a.* Tuttle, 3 *Conn.*, 247; 1 *Cow. & Hill's Notes*,
58; Land *a.* Tyngsborough, 9 *Cush.*, 36; Luby *a.* Hudson R.

R. Co., 17 *N. Y.*, 131; Moore *a*. Meacham, 10 *N. Y.* (6 *Seld.*), 207.)

III. The letter purporting to be written by Schumacher to Martin, and bearing date at New York on the 21st of August, 1850, was improperly admitted in evidence. (Utica Ins. Co. *a*. Badger, 3 *Wend.*, 102.)

IV. Martin represented to Lacey, the agent of the Company, that Schumacher was the moneyed man of the concern of Valton, Martin & Co.; this was expressly stated at the time of and as a part of the application for the insurance; the representation was made with the purpose of removing an unfavorable impression created by the personal appearance of Schumacher, whose dress and look denoted him to be a laboring man, and whom Lacey supposed to be a porter in the store. The jury, by their verdict in favor of the plaintiffs, must have found, as matter of fact, either, 1. That the representation was not made; 2. That if made, it was true; or, 3. That although made, and although false, it had no material effect on the judgment of Lacey, in influencing his action upon the application for the policy. There is no evidence in the case upon which any one of these propositions could be found.

V. The judge refused to permit the defendants to show, by Dr. Staats, whether, from his knowledge and observation of Schumacher, he would have recommended the acceptance of the proposal if the representation had not been made; whether the representation produced any effect on the mind of the witness; and whether it had any influence upon his subsequent action in making his certificate and report. The relevancy and materiality of this inquiry seem obvious; by reason of its exclusion, the jury were deprived of testimony most important in its bearing upon a point expressly submitted to them by the presiding judge: the exceptions, therefore, of the defendants, in this respect, were well taken.

VI. John Denmee, drawn in the panel of jurors, was duly qualified by law to sit as a juror in the case, and the presiding judge erred in sustaining the plaintiff's challenge to him for principal cause. (2 *Rev. Stat.*, 411, 415.) No right of challenge for principal cause *propter defectum* is given by the Revised Statutes. It manifestly was not the intention of the Legislature to permit a party to object to a juror on grounds

upon which the court itself is not authorized to discharge him. If the right of challenge now exists at all, it can only be to the extent allowed under the former law—that is, not that the juror challenged has not been assessed in the required amount, but that he was not, in fact, at the time of the challenge worth it.

*Clark B. Cochrane* and *John K. Porter*, for the respondents.—I. The verdict was clearly in accordance with the evidence upon each of the questions litigated at the trial.  1. The fact of Schumacher's death was established beyond all controversy, and was proved to the satisfaction of the jury.  2. The pretence that Schumacher did not pay the premium, is not only unsustained, but affirmatively disproved.  3. The pretence that the assured misrepresented his vocation, is utterly unsupported by the evidence.  4. The pretence of fraudulent oral misrepresentations by Schumacher to Lacey, is wholly unfounded.  5. The strange defence that Schumacher, "with or without his concurrence," had been secretly kidnapped or murdered for the benefit of the partners, is surely not one to be credited, without some affirmative evidence of its truth.  6. The theory of the defendants, that Schumacher entered into a conspiracy with Martin and Valton to get his life insured by false pretences, and then be murdered for their benefit, is not so probable that a second verdict of a jury should be condemned for questioning it.

II. All the questions of fact in the case were fully and fairly submitted to the jury, under a charge to which no valid exceptions were taken on either side; and a verdict upon those questions is conclusive. (Cohen *a.* Dupont, 1 *Sandf.*, 260 ; Fleming *a.* Hollenback, 7 *Barb.*, 271, 275 ; Douglass *a.* Tousey, 2 *Wend.*, 352 ; Borst *a.* Spelman, 4 *N. Y.* (4 *Comst.*), 284 ; Hart *a.* Rensselaer & Saratoga R. R. Co., 8 *N. Y.* (4 *Seld.*), 37, 43.)

III. The challenge to the juror, John Denmee, was properly sustained by the court. (2 *Rev. Stat.*, 411, 415, 508 ; Boyd *a.* State, 1 *Howard* (*Miss.*), 163 ; 2 *Cow. Tr.*, 2 ed., 881, 888 ; 2 *Laws of* 1847, 734, ch. 495, § 1.)  Even if it had been otherwise, the allowance of the challenge would, in this case, have furnished no ground for a reversal of the judgment.

IV. There was no error in the decisions of the court, on any of the questions presented as to the admission and exclusion of

evidence. 1. The several objections to the proof that Mr. Hadley drew the articles of copartnership by the instruction of the parties, were properly overruled. (Valton a. National, &c., Ins. Co., 22 *Barb.*, 9.) The admission of the evidence became wholly immaterial, as the fact of actual partnership, previous to the application, was afterwards established by independent and explicit proof. 2. The question put to the witness Valton, " When did you, and Martin, and Schumacher become partners?" was properly allowed. 3. The answer of the witness Lacey to the inquiry proposed to him, as to his course of business and practice, in a case where his opinion was adverse, was properly excluded by the court. 4. The court also properly excluded the question put to the medical examiner, Dr. Staats, " Is your opinion confined to matters of health, or the whole case ?" The witness had already testified that he had nothing to do with the applicant for insurance, except to examine his person. That his business was merely to examine and report as to the physical condition of his body, and that he had not to report any thing to the company but what his certificate contained, and that related exclusively to the person of the applicant. He further testified, that he had no instructions or authority from the company except what is contained in the papers to which the certificate with his name was attached. The examination required to be made by him was no other than that of a medical examiner. 5. Other questions proposed to Dr. Staats were also properly excluded by the court. 6. The letter from Schumacher of the 21st of August, remitting the second premium to Martin, was properly received in evidence. (Valton a. National, &c., Ins. Co., 22 *Barb.*, 9.)

V. The defendant's contract of insurance was with Schumacher. He obtained the policy for his own benefit, and had the right to dispose of it as he saw fit. No consideration was necessary to sustain the validity of the agreement. (Valton a. National, &c., Ins. Co., 22 *Barb.*, 9 ; Same a. Same, 20 *N. Y.*, 32.) It was at most a question of fact for the jury to determine from the whole evidence, whether the policy was taken out as security for such sums of money as Valton and Martin might advance, in procuring and establishing a distillery. The jury were fully and properly instructed upon all these questions, and have found against each proposition.

VI. There was no error committed by the court, either in giving or refusing instructions to the jury. There was evidence tending to show that Schumacher was a liquor merchant in Germany. In summing up the cause, the plaintiff's counsel had claimed that this evidence was sufficient to authorize the jury to find the fact that Schumacher had been in the wine and liquor business at Bremen. The twenty-one propositions submitted by the defendant's counsel, were presented at the close of the judge's charge, were most of them simply requests, designed to weaken the effect of the charge, by procuring the court to say, substantially, the same thing, in language less clear, pertinent, and appropriate. (Lyon a. Marshall, 11 *Barb.*, 241 ; Sherman a. Wakeman, *Ib.*, 254 ; Armstrong a. Tuffts, 6 *Ib.*, 432 ; Aeby a. Rapelye, 1 *Hill*, 9.) Even if the insurance had been obtained after an agreement by Schumacher to give Martin and Valton the contingent benefit of it, in the manner provided in their articles of copartnership, this would not have made the policy void. (Valton a. National, &c., Ins. Co., 22 *Barb.*, 9 ; Same a. Same, 20 *N. Y.*, 32 ; 1 *Phill. on Ins.*, § 358, 3 ed. ; Lord a. Dall, 12 *Mass.*, 115 ; Trenton, &c., a. Johnson, 4 *Zabrisk.*, 576 ; Dalvy a. India, &c., 80 *Eng. Com. Law R.*, 364 ; St. John a. American Mutual Life Ins. Co., 13 *N. Y.* (3 *Kern.*), 31 ; American Life, &c., a. Robertstraw, 26 *Penn. R.*, 189.) The judgment should be affirmed. No error was committed by the court. The facts were fairly and fully submitted to the jury, and the plaintiffs ought not to be deprived of the benefit of the second verdict in their favor.

BY THE COURT.—MILLER, J.—The trial of this cause at the circuit occupied considerable time, and during its progress many intricate questions were raised and decided. Some of these questions related to the admission and rejection of evidence offered upon the trial. It is the opinion of one of the members of this court, that an error was committed by the justice who tried the cause, in refusing to allow certain questions to be put to the witness Barent P. Staats, the medical examiner of the company at Albany, upon an examination of the applicant prior to the taking of the risk. In that opinion I cannot concur, and propose briefly to examine the questions

arising, for the purpose of ascertaining whether any error was committed by the judge in this respect.

The witness was examined on the trial in reference to the circumstances attending the medical examination of Schumacher. On his direct examination, he testified generally to his appearance, size, &c.; and also, that when Schumacher said the amount was $10,000, he replied that he must take off his coat and jacket, and must have a good indorser; it was a large amount, and he must have a good indorser for so large an amount. That he meant he must have a more thorough examination. That Martin then observed that he must not judge from appearances, that Schumacher was the moneyed man of the concern. The witness then proceeded with a more thorough examination. Upon his cross-examination, he swore that his only business was to examine his person, and to examine and report as to the physical condition of his body. Upon being asked if that was all he did, and if he made any other report, he answered, "That was all I did. I did not make any other report. I reported nothing to the company but what the certificate contains. That related exclusively to the person. The thoroughness of my examination does not depend upon the amount insured." He also stated that his fees did not depend upon the amount insured.

It will be perceived that the examination made by the medical examiner was confined entirely to matters relating to the physical condition and the health of the insured. Such is the testimony of the witness as to the line of duty required at his hands, and such would appear to be the natural and necessary scope of an examination of such a character. It would be entirely inconsistent with the apparent duty of a physician required to examine and report as to the physical condition of a person, to include in his examination matters which properly belonged to another department. This duty would more appropriately be assigned to the general agent of the company, who conducted its general business, and who would be supposed to take charge of all matters pertaining to the risk.

Independent of the positive evidence of the medical examiner, that his business was merely to examine and report exclusively as to the physical condition of the person; the report that he made was entirely confined to this. The interrogato-

ries propounded, as will be seen, related entirely to the physical condition. The opinion required, was an "opinion on the life," evidently showing that it was the design and intention of the company to confine him entirely to the specific duty of medical examiner.

It is claimed that a decided opinion, recommending the acceptance or rejection of the proposal, embraced every thing which related to the physical or the pecuniary condition of the applicant. It strikes me that this view of the question cannot be upheld. The decided opinion required, was limited to an opinion based upon the interrogatories previously propounded, and in accordance with the last interrogatory but one, "an opinion on the life." If it were otherwise, the medical examination would include a range of inquiry more appropriately belonging to another sphere. It would actually embrace that of the general agent and the company itself, whose business it was to look after the general interests of the corporation, and the general characteristics of the risk. It would be absurd to say that a physician, assigned by an insurance company to examine as to the physical condition and health of an applicant for a policy of insurance, was required to look after every possible aspect of the case, and to be governed and controlled by his or her pecuniary circumstances, in forming his opinion "on the life." I think the doctrine contended for is irrational and cannot be sustained.

Upon the redirect examination of the witness by the defendants, he further stated that he always took a memorandum of the amount, to settle his accounts with the company, and to graduate the amount of his fees. Upon being asked, when Martin said Schumacher was the moneyed man of the concern, Did you believe it? he replied: "I thought it must be a very small moneyed concern, if he was the principal of it." The question was then put to the witness, whether, if it had not been for that representation, he would have recommended the acceptance of the proposal. The witness had already sworn that he thought it must be a small moneyed concern, if he was the principal of it, and notwithstanding this, he had recommended the risk; and the question put tended somewhat to contradict his evidence in reference to the opinion he had expressed as to the representation and his written recommendation of the risk.

In this respect, it may be questionable if it was admissible. I think, however, that it was incompetent on other and stronger grounds. It called for the opinion of the witness upon a point upon which he was not required or authorized, within the legitimate performance of his duties, to express an opinion. He was the medical examiner of the company. What had he to do with the question, whether this man was the moneyed man of the concern? No such inquiry was propounded to him. No such fact was within the scope of his authority. It was. the physical, not the pecuniary condition of the insured that he was to examine. He was required to express an opinion on his life, not his property. He had already given an opinion as to that, from the examination made of his person. With this evidence introduced, it cannot fairly be claimed that he was required to go further and qualify it, by basing that opinion upon a matter that could have no connection whatever with his duties and responsibilities.

It is said that he was as competent to show the effect of such representations, as are the vendors of goods to show that they were induced by false representations to sell them, and as insolvents are to negate an intent to defraud their creditors in making a general assignment.

The cases are not analogous. Where a person sells goods to a fraudulent debtor, the whole transaction is presented. The fraudulent representations are the grounds upon which a recovery is sought. These are the inducement for the sale, and the effect they produced upon the mind of the vendor is material, important, and controlling. So in regard to an insolvent. This intent to defraud is the very essence of the matter in controversy. In the case of a medical examiner, the pecuniary condition of the applicant can have but little, if any thing, to do with his physical state. It is not properly before him. He is confined and restricted to a mere medical examination. Upon this his opinion is to be based. It is not within the scope of his power to express an opinion upon any other point, and he is disqualified from so doing by all the rules of law applicable to such cases. In order to require an opinion of a witness upon any subject, it must be made to appear that the subject-matter was one upon which he might properly be called upon to form an opinion, which would govern his action. In

the present case, the interrogatories which were presented to the witness clearly showed that the inquiry was not properly before him, as it was in the case referred to. By these interrogatories, he was restricted to the physical condition of the party. Besides the infallible testimony of the interrogatories themselves, the witness positively swears that such was the case. Can he be called upon to contradict the interrogatories and his own evidence, and to express an opinion whether he would have recommended the acceptance of the proposal, but for a representation that he was the moneyed man of the concern? I think not; and the question was properly excluded.

The second question, whether the representation had any, and if any, what effect upon the mind of the witness, is liable to the same objection, and the remarks already made are applicable.

The third question, whether the representation had any, and if any, what influence upon the subsequent action of the witness in making his certificate and report, is equally objectionable, and comes within the same category.

The two last questions were objected to upon the additional ground that they were cumulative. There may be some doubt whether the witness had not already sufficiently answered these questions, and virtually expressed his opinion as to the effect of the representation that Schumacher was the moneyed man of the concern, by signing the certificate, and by testifying that it was a very small moneyed concern, if he was the principal of it; in fact, whether he had not fully and completely negatived the idea that it had produced any effect and influence upon his mind, in recommending the risk, and in making his certificate and report. I am inclined to think that he had, and the defendant had, really, the whole benefit, by his answer to the question first put, which could be derived from an answer to all of the questions which were excluded on the trial. I am also of the opinion, that the questions were properly overruled for the reasons already given, and that this was not a case where the defendant was entitled to the opinion of the witness.

It is claimed that the question here presented is covered by the decision of the Court of Appeals, when this case was before them. (20 *N. Y.*, 32.) The court there held that a policy of insurance is avoided by a fraudulent representation in respect

to a fact not material to the risk, if, in the judgment of the insurer, it be material in respect to the inducements to undertake the risk. The question, in the Court of Appeals, arose upon an exception to the charge of the judge, and not upon a question as to the admissibility of evidence. There is a marked distinction, in my judgment, between a fraudulent representation made to an insurer and a statement made to a medical examiner, whose duties are expressly confined to an examination of the physical condition of the applicant. I have already discussed somewhat the difference between the two cases, and perhaps it is needless to say more. It may not be amiss to observe, that while the insurer, who is represented by the general agent of the company, has a general jurisdiction and control over the whole matter, the duties of the medical examiner are more specific, more narrow and circumscribed. The latter is a subordinate officer, acting under the general direction of the company or its general agent. I think that it cannot be fairly claimed that it was within the province of the medical examiner to pass upon the question whether the applicant was the moneyed man of the concern. He was not called upon to decide any such question. And such a representation would not properly have exercised any influence whatever upon his judgment, unless he assumed far greater power than was conferred upon him.

On the other hand, the general agent is the representative of the company. He receives the application, examines into the whole case connected with the issuing of the policy, receives the premium, and delivers the policy. He is, in fact, the insurer. And any representation made to him, if it influences his mind, is material and important. There is a broad distinction between the two cases. And while there appears to be no propriety in asking the opinion of the medical examiner as to the pecuniary circumstances of the person examined, there is an eminent appropriateness, a peculiar fitness, in ascertaining whether the judgment of the general agent was influenced by any such representations.

It is also said that the judge, at the circuit, upon the request of the defendant's counsel, charged that if the medical examiner of the company was induced by the false representation that Schumacher was the moneyed man of the concern, to rec-

ommend the acceptance of the application, and such recommendation had a material influence with the company in inducing them to issue the policy, then the policy was void, and the plaintiffs could not recover. Considerable stress is laid upon this portion of the charge, to sustain the position that the questions were proper. I incline to the opinion that the charge may have been correct, in reference to the testimony already given. It must be borne in mind that the witness had already testified that he thought that it must be a small moneyed concern, if he was the principal of it; and hence it may not have been improper for the judge to have charged as he did in reference to the testimony presented, with this expression of the opinion of the witness, and his action showing that the representation could have no influence upon his judgment under the circumstances, and with the charge of the judge pointedly upon the question.

Can it be urged with any force that the exclusion of the evidence had any weight upon the decision of the jury? I deem it unnecessary to pursue the inquiry further, preferring to dispose of the question upon other, and what I deem more substantial grounds.

It will be remembered that the judge was called upon to charge upon over twenty distinct propositions by the defendants' counsel. He charged upon most of these in favor of the defendants. Conceding that in the one referred to he made a mistake, it cannot be regarded a ground of complaint. The plaintiff may have excepted for this reason, but no argument in favor of the defendants' position that the evidence was proper, can be drawn from the fact that the judge charged in conformity with it. It only shows that the judge charged more favorably for the defendants than was warranted, as he clearly did, if the charge covered the questions overruled. And it has been repeatedly held by frequent decisions of this general term that this is no ground of error.

Even if it shows the judge was inconsistent, which I am not prepared to admit (and this is the utmost which can be claimed for the charge in this particular, so far as it bears upon the question now discussed), yet it is no ground for urging that he erred in rejecting the evidence.

A judge is frequently called upon, at the close of an impor-

ant and lengthy trial, to charge upon numerous propositions involving intricate and important questions, which he must necessarily dispose of without much examination, and with little deliberation. In my judgment, it should be his aim and object, so far as practicable, to divest the case of difficult and troublesome questions: while he guards the rights of all parties in his charge, he should be careful to injure none by refusing to charge upon propositions made to him by learned counsel. If his charge is more favorable than is demanded, it cannot be regarded by the party who has the benefit of it as an argument in favor of a new trial upon another point of the very same character, and embracing the same principle taken by him upon the trial in another stage of the case. It is at most an error which the party who excepts to it alone can complain of. As I have already shown, the charge as made may have been pertinent as the case stood : if it was not, the defendants have not lost any rights, and their grounds for a new trial must not rest upon the fact that the judge charged as they claim was right upon one proposition, even although he may have committed an error in deciding differently upon another ruling. The defendants must stand or fall upon the correctness of the ruling of the judge upon the admissibility of the evidence rejected ; and I think the judge properly excluded the questions put to the witness.

I have confined my remarks to a discussion of the question presented in the opinion of the learned judge; but upon an examination of the other questions involved, I am satisfied that no error was committed on the trial. In a case of this magnitude, which has been twice tried at great length, and at large expense, while the forms of law should be duly observed, while the rights of all parties should be carefully and sacredly guarded, while we should rigidly scrutinize the proceedings of the trial to see that no error was committed, even if it is purely technical, and that no injustice has been done, a new trial should not be granted unless some plain legal rule or principle has been violated. I cannot see that such has been the case. I am therefore constrained to differ from the opinion of the learned judge in favor of granting a new trial.

A new trial should be denied, and judgment affirmed with costs.

GOULD, J.—The sole point discussed in the two opinions before me relates to the rejection of the testimony (offered by the defendants) of Dr. Staats, as to his being influenced by fraudulent representations to recommend the risk to the company.

No doubt the charge, given at the request of the defendants, did say that if the medical examiner of the company was influenced by the false representations that Schumacher was the moneyed man of the concern, to recommend the acceptance of the risk, and that recommendation had a material influence on the company in inducing it to issue the policy, the policy was void, and the plaintiff could not recover. But the judge's seeing fit to gratify the defendant by stating such a point, cannot make relevant testimony not otherwise relevant. And, from a careful examination of the case, it would seem that the excluded testimony, as well as that admitted, as to Dr. Staats being influenced by the false representations, could, in no view, be relevant.

The last question of those addressed to him by the company's circular was, of necessity, but a summing up of the prior questions, equivalent to asking, "Since you have, in detail, stated the particulars as to the applicant's health, will you state, in conclusion, whether on the whole his health is such that you consider the risk a desirable one; and would you, as to that ground, recommend its being taken?"

This question is to be considered as applied to the subject-matter before him. And the company must have understood it, as this court would understand it, precisely as it purports. And, taken in that sense, it is merely impossible that the element of his pecuniary condition, instead of his sanitary, could have influenced the answer. The doctor would hardly say that his being a moneyed man would alter the number of pulsations, the liability to coughs, or the likelihood of living long. And as it could not alter any of the prior answers, how could it affect the concluding inference?

To have the answer influence the company, it was necessary that it be an answer to the company's question; and we are to view it in the light in which the company would, from the paper, understand it. And there is in the case no shadow of proof as to any effect it had on the company.

In that view, I see no error in the ruling. And whether I

should have found the verdict or not, I hardly deem this ground sufficient to order a new trial.

HOGEBOOM, J.—When this case was before the Court of Appeals, it was held that a policy of insurance is avoided by a fraudulent representation in respect to a fact not material to the risk, if in the judgment of the insurer it be material in respect to his inducements to undertake the risk. The particular request which the defendants' counsel made to the judge at the circuit, in the trial then reviewed, was, that if it was untruly represented by Schumacher, or in his behalf, to the agent of the defendants, that Schumacher was the moneyed man of the concern, and that the defendants would not have issued the policy without this, then the policy was void. The judge refused so to charge, and the Court of Appeals granted a new trial, for that and kindred errors. The general principle established was, that fraudulent representations made to the insurer, though not material to the risk, yet material in the judgment of the insurer, and inducing the risk, will avoid the policy. The court made no distinction in this case between representations made to the defendants, or their directors or officers in New York and their agent at Albany.

The judge at the present trial charged in accordance with this doctrine. He went further, and in conformity with the request of the defendants' counsel, charged that if the agent, but for the false representation made by or in behalf of Schumacher, that he was the moneyed man of the concern, would not have acted further on the representation (that is, not have recommended to his principals the issuing of the policy), then the policy was void. It appears to have been assumed that if the agent had recommended the rejection of the application, it would have been rejected by his principals.

In another part of the charge the judge held, and I think properly, within the scope of the decision of the Court of Appeals, that if the defendants were induced to issue the policy by the false representation made to their agent, that Schumacher was the moneyed man of the concern, it was void. Mr. Lacey, the agent, had stated in substance, that but for the representation that Schumacher was the moneyed man of the concern he would have recommended the rejection of the application.

The judge at the circuit, upon the request of defendants' counsel, went further still, and charged that if the medical examiner of the company was induced by the false representations that Schumacher was the moneyed man of the concern to recommend the acceptance of the application, and such recommendation had a material influence with the company in inducing them to issue the policy, then the policy was void, and the plaintiff could not recover.

I think this charge also was within the spirit of the rule laid down by the Court of Appeals. The medical examiner must be regarded as much, and in as important a sense, the agent of the company as the local agent at Albany, Mr. Lacey. And his recommendation of the acceptance of the risk must be deemed likely to have had a material and controlling influence with the company in inducing the acceptance of the application.

All testimony, therefore, properly tending to show that the representation of the pecuniary responsibility of the applicant had an influence upon the medical examiner in inducing his recommendation of the acceptance of the application, was admissible.

There was testimony in the case tending to show that representations of that character were made to Doctor Staats. There was also testimony to show that these representations were false.

The effect which these representations had upon the mind and the action of Doctor Staats was sought to be ascertained, on the part of defendant, by three questions put to him, all of which were overruled, and I think improperly. The first was, whether he would have recommended the acceptance of the proposal but for this representation?

The object, of course, was to show he would not, and the question was material. He was competent to show the effect of such representation upon his action; as are vendors of goods to show they were induced by false representations to sell them; and as are insolvents who make a general assignment, to negate an intent to defraud their creditors in making the assignment.

The second question was, Did the representation produce any, and if any, what effect upon your mind?

This question was equally admissible; and although it was not as comprehensive as the first, it tended in the same direc-

Valton *a*. The National Loan Fund Life Assurance Company.

tion, and was perhaps designed to remove any doubt as to its being leading.

The third question was, whether the representation had any, and what influence upon his subsequent action in making his certificate and report.

This question was, I think, of the same character, and directly tended to favor facts material to the case, and material to the view which the judge subsequently took of it in his charge to the jury.

Similar evidence to that here excluded was admitted from the witness Lacey. I do not perceive any solid distinction between the two cases, nor why, in law, the recommendation of the general business agent of that locality should be regarded as of any more competency than that of the medical agent.

If my brethren agree with me in this view of the case, it is not indispensable to examine any of the other questions which arose on the trial; and as some of them are of some difficulty and complexity, I prefer not to embarrass a future trial with the discussion and decision of doubtful points.

With regard to the defendant's application to amend his answer, and as that failed to be acted on by reason of the denial of the motion for a new trial, I think the more appropriate disposition of it belongs to the special term, where the plaintiffs can be heard in opposition to the application.

My opinion is, that the judgment should be reversed and a new trial granted, with costs, to abide the event, and without prejudice to a renewal of the application by defendants at special term to amend their answer.

Judgment affirmed.